**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**Rock Hill Division**

| | | |
|---|---|---|
| **RAYMOND BUSCARINO,** | ) | |
| **On Behalf of Himself and Others** | ) | **Civil Action No.:  0:08-cv-03882-JFA** |
| **Similarly Situated,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Trial by Jury Demanded** |
| **v.** | ) | |
| | ) | |
| **TQ LOGISTICS, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.      INTRODUCTION

Plaintiff Raymond Buscarino filed this action on behalf of himself and others similarly situated seeking to recover unpaid overtime compensation pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*., from his former employer, Defendant TQ Logistics, Inc. ("TQ").  TQ seeks summary judgment asserting that the Plaintiffs are exempt from the overtime requirements of the FLSA pursuant to the motor carrier exemption. As will be shown, because TQ has not shown that the Plaintiffs meet the requirements of this exemption, this Court should deny TQ's motion.

## II.     STANDARD

To obtain summary judgment, a party must demonstrate that there exists no genuine issue of material fact, and that it is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  An exemption to the FLSA is an affirmative defense on which the defendant bears the burden of proof. *See Clark v. J.M. Benson Co*., 789 F.2d 282, 286 (4th Cir. 1986).  Moreover, a

defendant must prove the plaintiff's exempt status by clear and convincing evidence. *See Shockley v. City of Newport News*, 997 F.2d 18, 21 (4th Cir. 1993).

## III. STATEMENT OF MATERIAL FACTS.

1. TQ contracted with Abitibi/Bowater ("Bowater") beginning in 2005 to perform "spotting services" at Bowater's paper mill in Catawba, South Carolina. (Catoe Dep., 34:12-23).

2. Under its contract with Bowater, TQ is required to perform "spotting services" within the private premises of Bowater's paper mill in Catawba, South Carolina. The scope of TQ's "spotting services" under its contract with Bowater is specifically limited to performing services on Bowater's premises. (Catoe Dep., 34:12-23).

3. In performing the spotting services, TQ's shuttle drivers only operate the shuttle trucks within one area of the Bowater paper mill. (Catoe Dep., 13:12-15).

4. Bowater's "over-the-road" carriers are responsible for the safety of the loaded trailers after they leave the Bowater facility and enter the highway in transit to their customer. (Catoe Dep., 33:14-34:1; 48:10-25).

5. TQ's shuttle drivers perform inspections on the trailers before they are loaded in order to prevent damage to Bowater's paper and injuries to Bowater employees at the Bowater paper mill. (Catoe Dep., 14:10-12; 16:8-22; 17:1-3; 19:21-20:1; 22:8-11; 30:8-10; 47:4-8).

6. For a brief period of time, TQ's shuttle drivers spotted empty trailers between the trailer pool and an overflow parking lot outside of the fenced and gated Bowater facility, but on Bowater's property. (Catoe Dep., 61:12-25; 62:5-63:7). The overflow parking lot was never used to store loaded trailers. (Catoe Dep., 65:1-8). This

spotting involved the TQ shuttle drivers spotting the empty trailer onto a road that ran through Bowater's property. (Catoe Dep., 10:20-25; 61:12-62:4).

7.     The spotting between the trailer pool and the loading dock occurred entirely within an area on Bowater's private property that is closed to the public and inaccessible without passing through a guarded gate. (Catoe Decl. ¶¶5-7).

8.     On one occasion during Thanksgiving of 2005 TQ rented an over-the-road tractor and transported property for Bowater from Catawba, South Carolina to Charlotte, North Carolina. (Crowe Dep., 18:2-10; Pitzer Dep., 14:19-23). These trips lasted for a couple of weeks. (Pitzer Dep., 15:11-13).

9.     David Crowe, who is not a Plaintiff in this action, was the only TQ shuttle driver from Bowater who participated in transporting the property from Catawba, South Carolina to Charlotte, North Carolina. (Crowe Dep, 18:11-19:13; Pitzer Dep., 20:12-14).

## IV.     ARGUMENT

Congress enacted the Fair Labor Standards Act in 1938 in order to protect workers from substandard wages. *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450U.S. 728, 739, 67 L.Ed.2d 641, 101 S.Ct. 1437 (1981).  As a general rule, the Fair Labor Standards Act requires an employer to pay an employee one-and-one half times his normal hourly rate for all time work in excess of forty hours in a workweek. 29 U.S.C. § 207(a)(1). This general rule, however, is subject to limited exemptions, which must be shown by the employer. *See Clark v. J.M. Benson Co.*, 789 F.2d 282, 286 (4th Cir. 1986) (An exemption to the FLSA is an affirmative defense on which the defendant bears the burden of proof.) When determining whether an employee is entitled to overtime compensation, "any exemption … must be narrowly construed giving due regard to the

plain meaning of the statutory language and the intent of Congress." *A.H. Phillips, Inc. v. Walling,* 324 U.S. 490, 493, 89 L. Ed. 1095, 65 S.Ct. 807 (1945). Thus, employers who claim an exemption applies to their employees must show that the employees fit plainly and unmistakably within its terms. *Id.* ("To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretative process and to frustrate the announced will of the people."); *See also Worthington v. Icicle Seafoods, Inc., 774 F.2d 349, 352 (9th Cir. 1984) (citing A.H. Phillips, Inc. v. Walling, 324 U.S. 490, 493, 89 L. Ed. 1095, 65 S. Ct. 807 (1945)).* In the Fourth Circuit, a defendant must prove the plaintiff's exempt status by clear and convincing evidence. *See Shockley v. City of Newport News*, 997 F.2d 18, 21 (4th Cir. 1993).

In the present case, TQ argues that the Plaintiffs are exempt under the motor carrier exemption set forth in 29 U.S.C. § 213(b)(1), which reads:

> (b) Maximum hour requirements. The provisions of [29 U.S.C. § 207] shall not apply with respect to –
>
> (1) any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 204 of the Motor Carrier Act, 1935 [49 U.S.C. § 31502] ….

29 U.S.C. § 213(b)(1). Thus, § 213(b) exempts from the overtime compensation provisions those employees who are subject to the jurisdiction of the Secretary of Transportation  pursuant to the Motor Carrier Act, and no concurrent jurisdiction exists between § 207 of the FLSA and § 31502 of the MCA. *See Jones v. Giles*, 741 F.2d 245, 249 (9th Cir. 1984) (citing *Levinson v. Spector Motor Serv.*, 330 U.S. 649, 661, 91 L.Ed. 1158, 67 S.Ct. 931 (1947)).

The Department of Labor's FLSA regulations recognize that "[t]he power of the Secretary of Transportation to establish maximum hours and qualifications of service of employees, on which the exemption depends, extends to those classes of employees and those only who: (1) Are employed by carriers whose transportation of passengers or property by motor vehicle is subject to his jurisdiction under section 204 of the Motor Carrier Act, and (2) engage in activities of a character directly affecting the safety of operations of motor vehicles in the transportation on public highways of passengers or property in interstate or foreign commerce within the meaning of the *Motor Carrier Act*." 29 C.F.R. 782.2(a) (internal citations omitted).

A.    **TQ Has Failed to Show That The Plaintiffs Engaged In Activities Directly Affecting the Safety of Operations of Motor Vehicles in the Transportation on Public Highways of Passengers or Property in Interstate or Foreign Commerce Within the Meaning of the Motor Carrier Act.**

In order to show that each Plaintiff is exempt, TQ must show that he qualifies in one of four specific categories of defined work. "The exemption is applicable, under decisions of the U.S. Supreme Court, to those employees and those only whose work involves engagement in activities consisting wholly or in part of a class of work which is defined: (i) As that of a driver, driver's helper, loader, or mechanic, and (ii) as directly affecting the safety of operation of motor vehicles on the public highways in transportation in interstate or foreign commerce within the meaning of the *Motor Carrier Act*. 29 C.F.R. 782.2(b)(2). TQ contends that the Plaintiffs are exempt under the motor carrier exemption because they perform the work of a "driver."  As will be shown, the Plaintiffs satisfy neither element, and are not subject to the motor carrier exemption.

1. **TQ Has Not Shown That the Plaintiffs Engaged in the Activities of the Class of Work of a "Driver."**

"A 'driver,' as defined for Motor Carrier Act jurisdiction is an individual who *drives a motor vehicle in transportation* which is, *within the meaning of the Motor Carrier Act, in interstate or foreign commerce*." 29 C.F.R. 782.3(a) (emphasis added). Thus, in order to show that the Plaintiffs are exempt "drivers" within the meaning of the motor carrier exemption, TQ must show that each Plaintiff (1) transported property in "interstate commerce" (2) by "motor vehicle" within the meaning of the Motor Carrier Act. TQ has not shown either of these elements.

a. **TQ Has Not Shown That the Shuttle Trucks Used by the Plaintiffs Were "Motor Vehicles" Within the Meaning of the Motor Carrier Act.**

Under the Motor Carrier Act, "[m]otor vehicle means any vehicle, machine, *tractor*, *trailer*, or semitrailer propelled or drawn by mechanical power and *used upon the highways* in the *transportation of passengers or property*...." 49 C.F.R. §390.5 (emphasis added). The MCA defines "highway" to mean:

> any road, street, or way, whether on public or private property, open to public travel. *'Open to public travel' means that the road section is available*, except during scheduled periods, extreme weather or emergency conditions, passable by four-wheel standard passenger cars, *and open to the general public for use without restrictive gates, prohibitive signs, or regulations* other than restrictions based on size, weight, or class registration...."

*Id.* (emphasis added).

In its supporting memorandum, TQ does not include any argument that the Plaintiffs operated a "motor vehicle." Instead, TQ simply asserts that "the Plaintiffs 'spotted' trucks by moving empty trailers with a *DOT certified tractor* from the trailer pool *over a public highway* to be loaded at the Bowater facility." Def. Mem., p. 11.

(emphasis added). Simply calling the shuttle truck a DOT certified tractor does not show that it meets the definition of a "motor vehicle."

TQ argues that the shuttle drivers operated a motor vehicle when they spotted trailers from the trailer pool to the loading dock because the path of travel was over a "public highway," but offers no factual support for this assertion. In fact, TQ cannot show that the Plaintiffs drove a motor vehicle on a highway for any "spots" between the trailer pool and the loading dock because their entire path of travel was within an area of the Bowater facility that is inaccessible to the public without going through a secured gate. Catoe Decl, ¶¶ 4-7.  Thus, because of this fact alone, all "spots" from the trailer pool to the loading dock, or from the loading dock to the trailer, whether the trailer was loaded or unloaded, cannot serve to exempt any of the Plaintiffs as they do not involve the use of a "motor vehicle."

Likewise, TQ has not met its burden of showing that any of the Plaintiffs operated a "motor vehicle" as a result of "spotting" trailers to the employee parking lot that was used as an "overflow" trailer pool for an unspecified finite period of time. TQ contends that certain shuttle drivers spotted both empty and loaded trailers to the overflow lot as its undisputed fact #21, and supports this contention through the Affidavit of David Crowe. Def. Mem., p. 6 (Undisputed Fact #21).[1] With regard to whether certain TQ shuttle drivers spotted *loaded* trailers to the overflow lot during this limited period of time, Plaintiffs have properly contested this fact and assert that only empty trailers were

---

[1] TQ cites to some of the Plaintiffs' deposition testimony, but this testimony does not support that they spotted *loaded* trailers to the overflow lot. Both Warren Chisolm and Leonard Baxter only testify as to empty trailers. Chisolm Dep., p. 16:15-23; Baxter Dep., p. 32:4-8. Richard Evans testified that they spotted defective and damaged trailers to the overflow lot to make room for loaded trailers in the trailer pool. Evans Dep., p. 20:26-23. Neither Richard Roof nor Larry Wilson specify as to whether they took loaded or empty trailers to the overflow lot. Roof Dep., p. 17:10-23; Wilson Dep., p, 16:6-11.

spotted to the overflow lot. Calvin Catoe, Bowater's employee who oversees the shuttle drivers' work in the trailer pool, testified with regard to the overflow lot that "we would never put a loaded trailer out there, only the empties, because there is no concrete pad." Catoe Dep., p. 64:4-6. Mr. Catoe also testified that "the overflow area was only used for the empties coming in. It was never used for loads going out, okay?" Catoe Dep., p. 65:1-3. Thus, TQ is not entitled to summary judgment based on its argument that certain shuttle drivers spotted loaded trailers to the overflow lot for a limited time period because this fact is contested.

With regard to the spotting of *empty* trailers to the overflow lot, this activity did not involve a "motor vehicle" because it does not involve the transportation of property. In order to show that a Plaintiff operated a "motor vehicle" within the meaning of the Motor Carrier Act, TQ must show that he ***transported passengers or property*** in interstate commerce. Simply put, the spotting of an *empty* trailer cannot involve "transportation of passengers or property" because the empty trailer, which by definition is a part of the "motor vehicle,"[2] is not carrying either. Thus, TQ cannot exempt any of its shuttle drivers as a "driver" simply by showing the he spotted an empty trailer to the overflow parking lot.

  **b.**  **TQ Has Not Shown that Any Plaintiff Engaged In "Transportation In Interstate or Foreign Commerce" Within the Meaning of the Motor Carrier Act.**

"[T]he activities of drivers … in connection with transportation which is not in interstate or foreign commerce within the meaning of the Motor Carrier Act provide no basis for exemption under section 13(b)(1) of the Fair Labor Standards Act." 29 C.F.R.

---

[2] As shown above, the Motor Carrier Act's definition of "motor vehicle" includes both the tractor and the trailer. 49 C.F.R. §390.5.

782.2(d) (citations omitted). For purposes of the Motor Carrier Act, "interstate commerce" is not given the same broad meaning as the term is given in other contexts. 29 C.F.R. § 782.7. Instead, the Motor Carrier Act defines interstate commerce to mean "trade, traffic, or transportation in the United States – (1) Between a place in a State and a place outside of such State (including a place outside of the United States); (2) Between two places in a State through another State or a place outside of the United States; or (3) Between two places in a State as part of trade, traffic, or transportation originating or terminating outside the State of the United States." 49 C.F.R. §390.5.

The differences between the activities that bring an employee within the interstate commerce requirements of the FLSA and the Motor Carrier Act are explained by the DOL regulations:

> [S]ection 13(b)(1) of the Fair Labor Standards Act does not exempt an employee of a carrier from the act's overtime provisions unless it appears, among other things, that his activities as a driver, driver's helper, loader or mechanic directly affect the safety of operation of motor vehicles in transportation in interstate or foreign commerce within the meaning of the Motor Carrier Act. What constitutes such transportation in interstate or foreign commerce, sufficient to bring such an employee within the regulatory power of the Secretary of Transportation under section 204 of that act, is determined by definitions contained in the Motor Carrier Act itself. These definitions are, however, not identical with the definitions in the Fair Labor Standards Act which determine whether an employee is within the general coverage of the wage and hours provisions as an employee "engaged in (interstate or foreign) commerce." For this reason, the interstate commerce requirements of the section 13(b)(1) exemption are not necessarily met by establishing that an employee is "engaged in commerce" within the meaning of the Fair Labor Standards Act when performing activities as a driver, driver's helper, loader, or mechanic, where these activities are sufficient in other respects to bring him within the exemption."

29 C.F.R. § 782.7 (citations omitted). "Highway transportation by motor vehicle from one State to another, in the course of which the vehicles cross the State line, clearly

constitutes interstate commerce under both acts." 29 C.F.R. § 782.7(b)(1) (citations omitted). "The result is no different where the vehicles do not actually cross state lines but operate solely within a single state, if what is being transported is actually moving in interstate commerce *within the meaning of both acts*; the fact that other carriers transport it out of or into the State is not material." Id. (citations omitted). "Transportation within a single state is interstate commerce *within the meaning of the Fair Labor Standards Act* where it forms a part of a "practical continuity of movement" across State lines from the point of origin to the point of destination."[3] Id. (citations omitted). "Since the interstate commerce regulated under the two acts is not identical … such transportation may or may not be considered also a movement in interstate commerce within the meaning of the Motor Carrier Act." Id.

TQ has not shown that the Plaintiffs engaged in interstate commerce within the meaning of the Motor Carrier Act when they spotted trailers between the loading dock and the trailer pool, all of which occurred within the guarded area of the Bowater facility. The DOL regulations point out that "hostlers" who 'spot' trucks and trailers at a terminal dock for loading and unloading *are not exempt as drivers merely because as an incident of such duties they drive the trucks and tractors in and about the premises of the trucking terminal."* 29 C.F.R. 782.3(b) (citations omitted) (emphasis added). Likewise, the DOL Field Operations Handbook shows that the spotting duties performed by the Plaintiffs do not qualify them for the exemption. The Handbook's section on "Spotting" reads:

> The movement of trucks, tractors, or trailer (either empty or loaded) *over the public highways* between loading platforms, the garage, storage

---

[3] TQ mistakenly applies this standard to interstate commerce under the Motor Carrier Act. Def. Mem., p. 12.

facilities or terminals, ***where such movement is either the beginning or continuation of an interstate or foreign journey***, is itself transportation in interstate or foreign commerce subject to the jurisdiction of the DOT. ***If such "spotting" of equipment takes place entirely on the premises of a terminal or other private property, however, DOT would have no such jurisdiction since it would not be transportation over the public highways."***

DOL Field Operations Handbook, 24b "Safety-Affecting Activities", 24b00 "Spotting" trucks, tractors, trailers (emphasis added). Thus, the spotting activities performed by the Plaintiffs between the trailer pool and the loading dock, all of which occurred entirely on Bowater's guarded premises, cannot form the basis of DOT jurisdiction as a matter of law.

Likewise, these regulations show that the spotting performed by any shuttle drivers that required a brief drive on Cureton Ferry Road is similarly not transportation in interstate commerce within the meaning of the Motor Carrier Act. TQ contends that "the movement of trailers from the trailer pool to the employee parking lot served as the beginning of an interstate journey." p. 12. With regard to the spotting of *empty* trailers to the overflow lot, this "movement" cannot serve as the beginning of the interstate journey for the shipment of Bowater paper because ***no paper is being moved***. Instead, it is simply the movement of an empty trailer, which is not transportation of "property." With regard to the spotting of *loaded* trailers to the overflow lot, whether TQ shuttle drivers actually spotted loaded trailers to this lot is a properly disputed fact. Accordingly, TQ is not entitled to summary judgment as a matter of law. Moreover, even if the Plaintiffs spotted loaded trailers to the overflow parking lot, this would not be the beginning of an interstate journey because the trailer has not been given to an over-the-road carrier. Simply moving

property from one portion of the Bowater mill to another portion of the Bowater mill is not putting the paper into interstate transportation.

The DOL regulations further illustrate that the spotting of trailers performed by the Plaintiffs falls within the meaning of interstate commerce for purposes of coverage under the FLSA, but does not fall within the meaning of transportation in interstate or foreign commerce for purposes of the Motor Carrier Act. "The wage and hours provisions of the Fair Labor Standards Act are applicable not only to employees engaged in commerce, as defined by the act, but also to employees engaged in the production of goods for commerce. Employees engaged in the "production" of goods are defined by the act as including those engaged in "handling, *transporting*, or in any other manner working on such goods, or in closely related process or occupation directly essential to the production thereof in any State." 29 C.F.R. § 782.7(c) (citing 29 U.S.C. § 203(j)). "Where transportation of persons or property by motor vehicle between places within a State falls within this definition, and is not transportation in interstate or foreign commerce within the meaning of the Motor Carrier Act because movement from points out of the State has ended or because movement to points out of the State has not yet begun, the employees engaged in connection with such transportation (this applies to employees of common, contract, and private carriers) are covered by the wage and hours provisions of the Fair Labor Standards Act and are not subject to the jurisdiction of the Secretary of Transportation. ***Examples are: (1) Drivers transporting goods in and about a plant producing goods for commerce; …."*** Id. "These and other employees engaged in connection with the transportation within a State of persons or property by motor vehicle who are subject to the Fair Labor Standards Act because engaged in the production of

goods for commerce and who are not subject to the Motor Carrier Act because not engaged in interstate commerce within the meaning of the act, are not within the exemption provided by section 13(b)(1)." Id. (internal citations omitted). Thus, because Plaintiffs' spotting activities occurred within South Carolina, and the movement of Bowater's paper to points outside of the state had not yet begun, they are not exempt.

**2.  The Plaintiffs Did Not Perform Work That Affected The Safety of Operation of Motor Vehicles In Transportation of Property In Interstate Commerce.**

TQ has not shown that the Plaintiffs engaged in activities "directly affecting the safety of operation of motor vehicles on the public highways in transportation in interstate or foreign commerce within the meaning of the Motor Carrier Act." "Except insofar as the Commission has found that the activities of drivers, driver's helpers, loaders, and mechanics, as defined by it, ***directly affect such "safety of operation,"*** it has disclaimed its power to establish qualifications of maximum hours of service under section 204 of the Motor Carrier Act." 29 C.F.R. 782.2(d) (citations omitted) (emphasis added). "Safety of operations as used in section 204 of the Motor Carrier Act means '***the safety of operations of motor vehicles in the transportation of passengers or property in interstate commerce, and that alone***.'" Id. (internal citations omitted) (emphasis added). As will be shown, TQ has not shown that the Plaintiffs engaged in work that directly affected the safety of operation of motor vehicles in the transportation of passengers or property within the meaning of the Motor Carrier Act.

TQ only contends that the Plaintiffs are exempt "drivers" under the motor carrier exemption. "The work of an employee who is a full-duty or partial-duty "driver," as the term "driver" is … defined, directly affects the "safety of operation" within the meaning of section 204 of the Motor Carrier Act ***whenever he drives a motor vehicle in interstate***

***or foreign commerce within the meaning of the act.***" 29 C.F.R. 782.3(b) (citations

omitted) (emphasis added).  Based on a citation to an unreported District Court decision

that held that "drivers" "almost always fall within this definition," TQ relies on its

arguments that the Plaintiffs are "drivers" as its basis for arguing they directly affect the

safety of operation of motor vehicles on the public highway. p. 14 (citing *Albanil v. Coast

2 Coast, Inc.*, 2010 WL 1404120, *8 (S.D. Tex. 2010).  TQ then sets forth a series of

unrelated tasks related not to the safety of operation of motor vehicles on the highways,

but to safety of Bowater employees and property while on Bowater's premises. TQ is not

entitled to summary judgment based on either of these arguments.

First, the Plaintiffs do not "directly affect the safety of operation of motor

vehicles" for similar reasons that they do not meet the definition of a "driver."  In order to

fall within the jurisdiction of the DOT, a driver must drive a "motor vehicle" in

"interstate or foreign commerce," as those terms are defined by the MCA. As shown

previously, with regard to the spotting that occurs entirely on Bowater's guarded

premises, this spotting activity does not fulfill the definitional requirements of either a

"motor vehicle," or "interstate or foreign commerce." See also 29 C.F.R. § 782.2(e)

("[T]he exemption does not extend to employees merely because they engage in activities

affecting the safety of operations of motor vehicles ***operated on private premises***.")

(emphasis added).  Also as shown previously, none of the Plaintiffs' spotting activities

involved "interstate or foreign commerce" as defined by the MCA. Thus, the Plaintiffs

spotting activities do not subject them to the jurisdiction of the DOT.

The other safety duties cited by TQ also do not bring the Plaintiffs within the

safety requirements of the exemption under the motor carrier exemption because they do

not fall within the defined duties of a driver, driver's helper, loader or mechanic. "The U.S. Supreme Court has accepted the Agency determination, that activities of this character are included in the kinds of work which has been described as the work of drivers, driver's helpers, loaders, and mechanics (see §§ 782.3-782.6) employed by such carriers, and *no other classes of employees employed by such carriers perform duties directly affecting the "safety of operation*."[4] 29 C.F.R. § 782.2(b)(1) (emphasis added). TQ argues that the Plaintiffs are exempt based on the safety "procedures the Plaintiffs were required to perform when inspecting each trailer at the trailer pool." Def. Mem. p. 15. Because these inspections do not bring the Plaintiffs within any of the four defined categories of work that has been determined to directly affect the safety of operation of motor vehicles on the highway, they cannot bring the Plaintiffs within the exemption.

The "safety" procedures also cannot bring the Plaintiffs within the exemption because it is undisputed that the procedures only directly affect safety on Bowater's private property. "The jurisdiction of the Secretary of Transportation under section 204 of the Motor Carrier Act relates to safety of operation of motor vehicles only, and "to the safety of operation of such vehicles on the highways of the country, and that alone." 29 C.F.R. § 782.2(e) (citing *Ex Parte Nos. MC-2 and MC-3, 28 M.C.C. 125, 192*; *U.S. v. American Trucking Ass'n*, 319 U.S. 534, 548). "Accordingly, the exemption does not extend to employees merely because they engage in activities affecting the safety of operation of motor vehicles operated on private premises." Id. Despite TQ's attempts to characterize the inspections performed by its shuttle drivers as being directly related to safety of operation of motor vehicles on the highway, it is clear that these inspections

---

[4] Although TQ correctly points out that the job titles given to employees do not matter, this does not relieve TQ of its obligation to show that the Plaintiff's duties fall within one of the four classes of jobs that qualifies for the exemption. See 29 C.F.R. § 782.2(b)(2).

were designed and intended to provide safety to Bowater mill employees and Bowater paper products during the loading process. TQ cites to its undisputed facts 4-6, 12 and 13 in support of this argument. TQ's undisputed fact #4 reads: "The standard operating procedures were developed to prevent physical injury to employees of Bowater and TQ." Def. Mem., p. 2. Moreover, a fair reading of the testimony cited in support of TQ's undisputed fact #4 shows that Bowater was only interested in the safety of Bowater employees. See Catoe Dep., p. 16:8-11; 17:1-3. TQ's undisputed facts ## 5, 6 and 13 do not relate to whether the inspections were related to highway safety or the safety of Bowater employees and property. Moreover, the portion of the deposition transcript cited by TQ in support of its undisputed fact #5 supports that the inspections were related to prevent property loss as it relates solely to the cost to reload a trailer that is damaged during the loading process. See Catoe Dep., p. 18:25-19:5. Finally, in TQ's undisputed fact #12 it asserts that "Bowater required the spotters to inspect the trailers prior to loading *to prevent the paper rolls from falling out on the road*." Def. Mem., p. 4, Undisputed Fact #12 (emphasis added). The testimony cited does not support this undisputed fact, and the line of questioning, which immediately follows a question related to the possibility of a load falling through the floor of a trailer, and Plaintiffs' counsel's objection, actually reads:

> Q.   Is that why Bowater requires its spotters to inspect the trailers prior to Bowater loading the commodity?
> A.   Yes. I mean, you know, of course we don't want our product falling out on the road, but initially we don't want anybody falling through the floor of the trailer, nobody getting hurt during the loading process.

Catoe Dep., p. 52:18-25. Moreover, Mr. Catoe had previously testified that Bowater has never had its product fall through the floor during transit. Catoe Dep., p. 27:18-28:12.

Thus, TQ has not provided factual support for its contention that the Plaintiffs have engaged in activities directly affecting the safety of operation of vehicles on the public highways as "drivers."

Not only does TQ not show that the safety procedures directly affected safety of operation of motor vehicles on the highways, but also the undisputed facts show conclusively that the "safety" inspections and duties of the shuttle drivers are related *solely* to safety of Bowater property and employees while on Bowater's premises. Calvin Catoe testified that each item on the standard operating procedures related to the safety of Bowater paper and employees relates to the safety of Bowater property and employees during the loading process. See Catoe Dep., pp. 13:23-31:23. During this testimony, Mr. Catoe repeatedly testified that each item on the standard operating procedures was related to the safety of Bowater property and employees during the loading process. He testified that the inspections were "definitely" a loss prevention measure, Catoe Dep., p. 13:16-18, and "rules designed to prevent loss of Bowater paper." Id., 14:10-12. As to the individual rules, he testified that they were designed for "the physical safety of the Bowater employees," and to prevent damage to Bowater paper within the Bowater facility. Id., p. 16:8-19, 17:1-3, 17:16-18, 17:19-24, 17:25-18:5, 19:20-20:1, 22:8-11. Accordingly, the Plaintiffs did not engage in activities directly affecting the safety of operation of motor vehicles on public highways.

**B.    TQ Has Not Met Its Burden of Showing That Any of The Plaintiffs Are Exempt For the Entire Period in Which They Worked.**

TQ has not met its burden of showing specifically that any of the Plaintiffs are exempt, and instead attempts to exempt all of its shuttle drivers based on activities that only occurred for a limited period of time. The courts have made clear that the exemption

is based on the activities of the individual employee, and an employer cannot simply exempt all of its employees, even if they fall within the same position. *See Dole v. Circle A. Constr., Inc.*, 738 F. Supp. 1313, 1319 (D. Idaho 1990) (citing *Morris v. McComb*, 332 U.S. 422, 434, 92 L.Ed. 44, 68 S.Ct. 131 (1947). "In *Morris*, the Supreme Court specifically recognized that an individual employee could be under the jurisdiction of the Department of Labor during one week, and under the jurisdiction of the Department of Transportation the next." Id. "If … a driver does not drive or operate a truck in interstate transportation of property in interstate or foreign commerce for an entire week, he is not subject to the [Motor Carrier Act] regulations herein prescribed during that week." *Morris v. McComb*, 332 U.S. 422, 434 n. 13, 68 S.Ct. 131, 92 L.Ed. 44 (1947). Thus, TQ must specifically show which drivers were subject to the motor carrier exemption during specific workweeks. It is undisputed that the Plaintiffs all spotted empty trailers from the trailer pool and the Bowater loading dock, and loaded trailers from the loading dock to the trailer pool, as a regular part of their duties. With regard to either the "spotting" of trailers to and from the overflow parking lot, or the one-time over-the-road trips from Catawba to Charlotte, TQ has not shown which Plaintiffs, if any, engaged in this activity, or the workweeks in which they did so, in order to show they are exempt for these activities.

TQ has not shown that any of the Plaintiffs are exempt as a result of the spotting trailers to and from the overflow parking lot. In order to show that a driver meets the exemption based on work performed by other drivers, TQ must show that it distributed the over-the-road trips indiscriminately among the drivers, and "that any driver might be called upon at any time to perform such work." 29 C.F.R. § 782.2(c)(1) (citing *Morris v.*

18

*McComb*, 332 U.S. 422. TQ cannot meet its burden with regard to the one-time over-the-road trips from Catawba to Charlotte as these trips were specifically assigned to four employees (the Bowater manager, a Bowater shuttle driver, and two TQ spotters that worked at other facilities) who made them during the entire week that they were performed. Thus, the trips were not distributed indiscriminately among the drivers, and none of the Plaintiffs could have been called upon to perform this work. Moreover, it is unclear as to which Plaintiffs actually worked for TQ at the time these trips were made. Plaintiffs whose employment occurred at other times could not have been called on to make those trips at all, regardless of how they were distributed. Furthermore, Plaintiffs who did work during this brief period could not be exempted for the entirety of their employment.

Likewise, TQ has not made the proper showing with regard to the overflow lot for all time periods during which the Plaintiffs worked. It is undisputed that the overflow lot was only used for a brief period of time, and that it is no longer being used. Catoe Dep., p. 56:11-20; 62:5-8; 62:9-25. Moreover, it is undisputed that the overflow lot is not likely to be used again in the future. Catoe Dep., p. 63:1-7; Nance Dep., p. 12:2-13:8; Crowe Dep., p. 16:16-18:1. TQ has not provided any evidence, however, of when the overflow lot was being used, which is necessary to show the workweeks during which any of the shuttle drivers could have been called upon to make this spot. Instead, TQ simply attempts to lump all of its shuttle drivers who have ever worked at the Bowater facility into a single "exempt" class based on the work of some shuttle drivers performing what TQ argues to be exempt work during a brief period of time. Thus, even if the Court finds that an employee who spotted trailers to and from the overflow lot was subject to the

jurisdiction of the Department of Transportation, TQ cannot have met its burden of showing which of the Plaintiffs were exempt.

## V. CONCLUSION

For the reasons set forth herein, Plaintiffs request that this Court enter judgment in their favor and against the Defendant.

Respectfully submitted,

RAYMOND BUSCARINO,
On Behalf of Himself and Others
Similarly Situated

By: s/William C. Tucker
William C. Tucker (Federal ID 6187)
Nelson & Tucker, PLC
600 Peter Jefferson Parkway, Suite 100
Charlottesville, Virginia  22911
Telephone:  (434) 979-0049
Facsimile:  (434) 979-0037
Email: william.tucker@nelsontucker.com

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Plaintiff's Memorandum In Opposition to Defendant's Motion for Summary Judgment was served by electronic mail on this 11th day of June, 2010 to the following:

Robert D. Moseley, Jr., Esq.
Jason Nutzman, Esq.
300 East McBee Ave.
Suite 500
Greenville, South Carolina 29601
(864) 242-6440 *Phone*
(864) 240-2474 *Fax*
rob.moseley@smithmoorelaw.com
jason.nutzman@smithmoorelaw.com